UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REGINA STEWART f/k/a REGINA
CULBREATH, individually and on
behalf of all others similarly situated,

     *Plaintiff,*

v.

TIDEWATER FINANCE COMPANY,
d/b/a TIDEWATER CREDIT
SERVICES, a Virginia corporation,

     *Defendant.*

Case No.:

Hon.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

---

PAESANO AKKASHIAN APKARIAN, PC
Brian M. Akkashian (P55544)
Devin W. Bone (P78853)
*Attorneys for Plaintiff*
7457 Franklin Road, Suite 200
Bloomfield Hills, MI 48301
(248) 792-6886
dbone@paalawfirm.com

---

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Regina Stewart f/k/a Regina Culbreath ("Ms. Stewart"), for herself and on behalf of others similarly situated, by and through her attorneys, Paesano Akkashian Apkarian, PC, hereby states as follows for her Class Action Complaint against Defendant Tidewater Finance Company d/b/a Tidewater Credit Services ("Defendant").

## INTRODUCTION

1.      Congress passed the Truth in Lending Act ("TILA") in 1968 to promote informed use of consumer credit.  TILA requires that creditors conspicuously display certain information, including total finance charges, in a manner easily understood by the average consumer.

2.      TILA provides protection to most consumers and penalties for those creditors that run afoul of the basic principles of the act. It is a powerful tool for consumers looking to protect their rights.  Most creditors follow the law strictly—others, like Defendant, do not.

3.      Defendant exploits the vulnerable and financially unsophisticated. Its business model intentionally targets individuals likely to fall behind on payments. Using shady accounting practices and deceptive contracts and monthly statements,

4.      Defendant extracts thousands of dollars in improper fees and interest from consumers by improperly inflating consumers' loan balances. Defendant is shielded by the unfortunate fact that most of their customers do not have the financial or legal acumen to discover Defendant's fraudulent actions, nor the resources to fight the same.

5.      When a loan comes due, Defendant offers consumers—confused why their loan is not paid off—the option to either (1) pay in full, or (2) refinance the accumulated fees into a new loan.

6.     Ms. Stewart fell into the Defendant's crosshairs in 2014 when she sought credit for a new car. Over a six-year period, Defendant nickeled and dimed Ms. Stewart, increasing the size of her loan balance by thousands of dollars.

7.     Defendant will be unhappy to learn that Ms. Stewart is not like their typical victims. Rather than agree to a new, predatory loan, Ms. Stewart demanded to see an accounting of her fees and sought guidance from financial professionals and attorneys.  In doing so, Ms. Stewart uncovered a scam that likely cost consumers tens of millions of dollars in unauthorized fees and interest.

8.     Defendant's business model relies on the disadvantaged staying quiet. Ms. Stewart refuses to do so.  She seeks relief under TILA and Michigan's common law claims of fraudulent misrepresentation, silent fraud, negligent misrepresentation, and innocent misrepresentation on behalf of herself and all others similarly situated who have been taken advantage of by Defendant.

## PARTIES, JURISDICTION, AND VENUE

9.     Ms. Stewart is a resident of the State of Michigan.

10.     Defendant is a Virginia corporation with a principal place of business located at 6520 Indian River Road in Virginia Beach, Virginia 23464.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Ms. Stewart alleges violations of federal law.

3

12.     This Court has supplemental jurisdiction over Ms. Stewart's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in Michigan, as evidenced by the loan agreement between Ms. Stewart and Defendant.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## GENERAL ALLEGATIONS

15.     Ms. Stewart is a fifty-two-year-old resident of Michigan.  She logs twelve-hour days working for the United States Post Office. Before working for the United States Post Office, she worked fifty hours per week at Burger King.

16.     In addition to working long hours in a demanding environment, Ms. Stewart is a mother to four children. She resides in Southfield, Michigan.

17.     Though she works hard on and off the job, Ms. Stewart has a below-average credit rating. As a result, her financing options are limited.

18.     When seeking a line of credit, Ms. Stewart is forced to accept interest rates that would be deemed outrageous—even predatory—to any person with an average or above-average credit rating.

19.     Ms. Stewart's experience is not unique. Millions of Americans similarly find themselves unable to secure lines of credit with reasonable interest rates or favorable terms due to their credit rating.

4

**Ms. Stewart Purchases a New
Car and Enters into a Loan
Agreement with Defendant**

20.     In July of 2014, Ms. Stewart needed a new car.

21.     She visited LaFontaine Motors, Inc., an automobile dealership based in
Dearborn, Michigan ("LaFontaine") and discussed a variety of base-model cars with
economy packages.

22.     Ms. Stewart settled on purchasing a 2015 Kia Sorento (the "Kia"). She
was presented with a Retail Installment Contract and Security Agreement by
representatives at LaFontaine (the "Agreement").

23.     The Agreement listed the seller as LaFontaine, with Defendant
identified as the creditor.  (Agreement, **Ex. 1**).

24.     The Agreement is a form contract. It contains a variety of spaces for
certain terms to be either typed or written in, and a collection of small print,
boilerplate terms and conditions.

25.     Upon information and belief, Defendant uses similar contracts in all of
its transactions with consumers purchasing automobiles using closed-ended lines of
credit provided by Defendant.

26.     The Truth in Lending Disclosures ("TILA Disclosures") in the
Agreement identify the Annual Percentage Rate, Finance Charge, Amount Finances,
and Total Sale Price.

27.    Ms. Stewart made a down payment of $1,000 on the Kia and financed the balance of $23,727.84, which included taxes and other, nondescript charges, pursuant to the Agreement.

28.    The Agreement provides that Ms. Stewart would make 72 monthly payments of $554.00 beginning on September 6, 2014.  (Ex. 1).  Ms. Stewart was required to pay finance charges totaling $16,160.16—or 18.95% APR.

29.    The total Ms. Stewart would pay during the life of her loan with Defendant was identified as $39,888.00.

30.    The TILA Disclosures note that if a payment is late, Ms. Stewart would be charged a late fee of "up to 5% of the payment due but not less than $15.00." Stamped over this disclosure was similar language in a different font.  It reads: "THE GREATER OF 5% OR $15."  (Ex. 1).

31.    The late fee disclosure is not clear on *when* a payment is deemed late. The numbers "10" and "15" are both stamped in the space identifying how many days must pass before the late fee is charged.

32.    Aside from the late fee, monthly payment, finance charges, and principal outlined above, no other fees, costs, or finance charges are disclosed or identified in the TILA Disclosures.

33.     Ms. Stewart signed the Agreement on August 7, 2014 and took possession of her Kia. She began making monthly payments to Defendant in September 2014 pursuant to the Agreement.

**Ms. Stewart Makes Payments for**
**Five Years Until the Kia Begins**
**Experiencing Maintenance Issues**

34.     For five years, Ms. Stewart made payments pursuant to the Agreement.

35.     While some of those payments were late, she understood that she would be charged a late fee equal to 5% of the payment due—or $27.70.

36.     However, Ms. Stewart was never informed by Defendant *when* she was charged a late fee.

37.     Monthly billing statements (the "Statements") sent to Ms. Stewart were nondescript.  They presented only figures for "Principal Balance," "Next Payment Amount" and "Total Amount Due."  While there was a "Delinquent Payment Due" section, it never identified any amounts being due.

38.     The Statements contained no further delineation of fees, expenses, or interest.

39.     Defendant's online and telephone payment portals (the "Payment Portals") also failed to alert Ms. Stewart that late fees were due pursuant to the Agreement.

40.     As a result, Ms. Stewart only made the $554.00 monthly payments that were identified as due on the Statements.

41.     Defendant, without Ms. Stewart's knowledge, quietly added the late fees to her loan balance, *subjecting them to interest charges over the life of her loan*.

42.     When making payments through the Payment Portals, Defendant charged Ms. Stewart a $10 convenience fee to process her payment (the "Convenience Fee").

43.     Defendant represented that the Convenience Fee was charged for the benefit of using the Payment Portals.

44.     Ms. Stewart relied on this representation, paying a total of $510 in Convenience Fees since September 2014 in order to use the Payment Portals.

45.     In early 2020, with her loan nearing the end of its seventy-two-month term, the Kia experienced maintenance issues.

46.     Ms. Stewart took the Kia to LaFontaine for service and was advised that trading the Kia in for a credit toward a new car was more financially prudent than repairing the aging Kia.

47.     Ms. Stewart agreed to trade-in the Kia, allowing LaFontaine's finance manager to contact Defendant regarding a payoff amount.

48.     After waiting two hours, LaFontaine informed Ms. Stewart that the balance on her loan was over $14,000, exceeding the Kia's trade-in value.

8

49.   In disbelief, Ms. Stewart called Defendant, who confirmed that the balance due was $14,753.69. They offered no explanation as to how such a large balance remained.

50.   Ms. Stewart requested that Defendant provide her with information regarding her payments, including all Statements on her account.

51.   To date, Defendant has largely ignored Ms. Stewart's request for information.

**Stewart Receives a Copy of her
Payment History and Unearths
<u>Defendant's Fraudulent Scheme</u>**

52.   Despite Defendant's failure to supply Ms. Stewart with the requested information, Defendant's employee Christopher Brown did email Ms. Stewart a copy of her six-year payment history on September 14, 2020 (hereafter the "Payment History," **Ex. 2**).

53.   To the untrained eye, the Payment History is nothing more than a collection of jumbled entries that reflect payments, interest, and fees added and subtracted from the balance of the loan's principal.

54.   However, upon closer examination, the Payment History memorializes two fraudulent schemes that intentionally target marginalized, unsophisticated consumers likely to make late payments.

55.     The first scheme is straightforward. As outlined above, Defendant adds late fees to consumers' loan balances, subjecting the late fees to interest charges. (Ex. 2).

56.     Monthly statements sent by Defendant did not account for late fees, past or present, in any way.

57.     Instead, the late fees charged to Ms. Stewart were included in the "Principal Balance" listed on the monthly statements.

58.     Adding late fees to the loan balance and subjecting individuals to interest is not authorized by, or disclosed in, the Agreement. Defendant did not otherwise disclose to Ms. Stewart that late fees would be added to the loan balance and incur interest.

59.     Defendant's addition of late fees to Ms. Stewart's loan balance—and their accumulation of interest over the life of the loan—is referred to herein as the "Late Fee Scam."

60.     The second scheme involves the Convenience Fees charged to Ms. Stewart when using the Payment Portals.

61.     When Ms. Stewart paid a Convenience Fee, she assumed the fee was paid to Defendant directly *for the benefit of* using the Payment Portals.

62.     That was not the case.

10

63.     Instead, when she "paid" a Convenience Fee, Ms. Stewart's monthly payment would increase by $10.00. This increased monthly payment would be applied to the loan balance, appearing as though Ms. Stewart made an additional principal payment of $10.00.  (Ex. 2).

64.     Defendant would then add the Convenience Fee to Ms. Stewart's loan balance, subjecting it to interest at a rate of 18.95% per year.

65.     To unsophisticated consumers, Defendant's accounting of the Convenience Fee appears to result in a wash—the increased monthly payment cancels out the Convenience Fee.

66.     This is by design and intentionally misleading.

67.     In reality, Defendant continues to derive revenue from the Convenience Fees (and interest) added to the loan balance indirectly through continued loan payments.

68.     Defendant did not disclose that Convenience Fees would be added to Ms. Stewart's loan balance and/or incur interest.

69.     The Agreement does not permit Defendant to charge Convenience Fees or add Convenience Fees to Ms. Stewart's loan balance.

70.     Defendant's misleading accounting of the Convenience Fee is referred to herein as the "Convenience Fee Scam."

11

**The Late Fee and Convenience**
**Fee Scams Create a Snowball of**
**Impermissible Fees and Interest**
**that Harms Vulnerable Consumers**

71.    Defendant's Late Fee and Convenience Fee Scams are especially harmful for consumers with increased loan balances, such as Ms. Stewart, or consumers who fall behind on payments.

72.    This is because adding late fees and Convenience Fees to a consumer's loan balance prohibits consumers from paying off their loan balances on time.

73.    Ms. Stewart's payment history perfectly illustrates the damaging effect of Defendant's snowballing fees.

74.    In August 2017, Ms. Stewart was halfway through her loan. Her remaining loan balance was $23,603.72.  She continued making monthly payments of $554.00 as directed by Defendant's Statements.

75.    Unbeknownst to Ms. Stewart, Defendant's addition of certain fees to her loan principal put her significantly behind in paying off the loan on time.

76.    For Ms. Stewart to pay off her loan within the agreed upon seventy-two months, her monthly payments *should have been* $864.62 per month.  (Amortization Calculation, **Ex. 3**).

77.    Yet, the Statements issued by Defendant continued to show a payment of $554.00 being due.

12

78.     When Ms. Stewart made a payment through Defendant's Payment Portal on August 3, 2017, she was "charged" a Convenience Fee. (Ex. 2, p. 5).

79.     Defendant increased her monthly payment to $564.00 and applied it to her loan balance. (Ex. 2, p. 5).

80.     Ms. Stewart's increased monthly payment, however, was insufficient to pay the *actual* monthly payment needed to pay off the loan on time, or $864.62. The difference—$300.62—went unpaid.

81.     Defendant then added the Convenience Fee to Ms. Stewart's loan balance. (Ex. 2, p. 5). This resulted $310.62 remaining outstanding after her payment, which would go on to incur interest at a rate of 18.95% per year.

82.     The regular addition of late fees and Convenience Fees to a consumer's loan balance can increase the consumer's loan balance by several thousand dollars over the life of their loan.

83.     Defendant's accounting of late fees and Convenience Fees has no cognizable benefit for consumers.

84.     The sole purpose is to generate additional interest (i.e. profit) on loans issued to consumers that Defendant knows are likely to miss payments.

**Defendant's Deceiving Monthly
Statements Ensure Consumers Fall
Into a Pattern of Underpaying Bills**

85.     Defendant's Late Fee Scam and Convenience Fee Scam are part of a larger scheme to defraud unsophisticated consumers.

86.     Not only does Defendant charge improper fees and interest, it does so while issuing Statements that are intentionally deceiving and missing important information.

87.     The Statements do not inform consumers when fees are added to their loan balances. Defendant simply increases the consumer's "Principal Balance" without any warning or explanation.

88.     The Statements also fail to inform consumers when increased monthly payments are needed to pay off their loan on time.

89.     This is essential to the Defendant's scheme.

90.     Continuing to display the original monthly payment amount—or otherwise alert consumers of the need for increased payments—lulls consumers into believing they are paying off their loan on time.

91.     To discover the true amount "due" each month to pay off the loan on time, consumers are required to independently calculate new amortization schedules each month.

92.    Placing this burden on consumers with limited financial acumen is, by its very nature, deceptive, fraudulent, and misleading.

93.    The Convenience Fee Scam, Late Fee Scam, and misleading Statements are collectively referred to as the "Fraudulent Scheme."

94.    The following example illustrates the effect of the Fraudulent Scheme. Assume Defendant approves a $25,000 loan at 18.95% APR over a sixty-month term.  A debtor making timely payments for the entire life of the loan, exclusively using the Payment Portals, would not be affected by the Convenience Fee Scam, Late Fee Scam, or misleading Statements.  His or her payments would follow the original amortization schedule produced at the time the loan is calculated:

| Payment Number | Monthly Payment Identified on Statements | (A) Monthly Payment Needed to Pay off Loan on Time | (B) Debtor's Actual Monthly Payment with Increased Principal from "Convenience Fee" | Difference between (B) and (A), which remains on the Loan Balance | Fees Added to Loan Balance | Total Remaining on Loan Balance |
|---|---|---|---|---|---|---|
| 1 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $24,746 |
| 2 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $24,489 |
| 3 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $24,228 |
| 4 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $23,963 |
| 5 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $23,694 |
|  |  |  |  |  |  |  |
| 59 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $637 |
| 60 | $647.83 | $647.83 | $657.83 | -$10.00 | $10.00 | $0 |

95.    However, if the same debtor makes late payments once every four months, with a late fee equivalent to 5% of the payment due (or, in this case, $32.39), the debtors loan balance increases overtime as a result of the Convenience Fee and

Late Fee Scams, leaving a balance of approximately $817 at the end of the sixty-

month term:

| Payment Number | (A) Monthly Payment Identified on Statements | (B) Monthly Payment Needed to Pay off Loan on Time | (C) Debtor's Actual Monthly Payment with Increased Principal from "Convenience Fee" | (D) Difference between (C) and (B), which remains on the Loan Balance | Fees Added to Loan Balance | Total Remaining on Loan Balance |
|---|---|---|---|---|---|---|
| 1 | $647.83 | $647.83 | $657.83 | -$10.00 | $42.39 | $24,779 |
| 2 | $647.83 | $648.94 | $657.83 | -$8.89 | $10.00 | $24,523 |
| 3 | $647.83 | $648.94 | $657.83 | -$8.89 | $10.00 | $24,262 |
| 4 | $647.83 | $648.94 | $657.83 | -$8.89 | $10.00 | $23,998 |
| 5 | $647.83 | $648.94 | $657.83 | -$8.89 | $42.39 | $23,761 |
|  |  |  |  |  |  |  |
| 59 | $647.83 | $1,053.44 | $657.83 | -$395.61 | $10.00 | $1,442 |
| 60 | $647.83 | $1,464.77 | $657.83 | -$809.64 | $10.00 | **$817** |

96.    Using the same math, a debtor who is late twice as frequently would

have a balance of $1,611 in unauthorized interest remaining at the end of their loan.

97.    The Fraudulent Scheme add hundreds, or even thousands, of dollars to

consumers' finance charges, effectively increasing the consumer's APR by several

percentage points.

98.    Put differently, Defendant increases its profits by misleading

consumers.

**Defendant's Scheme Concludes
with Consumers Being Forced to
Refinance their Predatory Loans**

99.    Consumers victimized by the Fraudulent Scheme are further harmed

because their underlying loans with Defendant are closed ended.

16

100. This means, when the term expires, the remaining balance becomes due immediately.

101. To fully collect on their loans, inflated by the snowballing effect of the Late Fee Scam and Convenience Fee Scam, Defendant offers individuals like Ms. Stewart an option to refinance the balance due, as long as the refinancing is on terms as favorable (to Defendant) as the original loan.

102. As of the filing of this Complaint, the total charged to Ms. Stewart for the Kia exceeds $54,000. Defendant's finance charges exceed the underlying principal of the Kia.

103. The cash price for a 2020 Porsche Macan—a luxury crossover—is less than the total amount Ms. Stewart will ultimately pay for the Kia.

## CLASS ACTION ALLEGATIONS

104. Ms. Stewart brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a proposed class consisting of all consumers who entered into loan agreements with Defendant and:

a. Were charged Convenience Fees to use Defendant's Payment Portals, which were subsequently added to their loan balances;

b. Were charged interest on Convenience Fees added to their loan balance; and/or

17

    c.   Were charged interest on late fees added to their loan balance

       (referred to herein as the "Class").

105.   The Class's claims extend from August 1, 2014 through present (the "Class Period")

106.   The members of the Class and Subclasses are so numerous that joinder of all class members is impractical.

107.   Defendant's website states that it has partnerships with 800 dealers around the United States.  If Defendant entered into only 10 loans per year at each dealership, the number of potential Class members could exceed 40,000 consumers. This hypothetical excludes the partial years of 2014 and 2020 included in the Class Period.

108.    Ms. Stewart's claims are typical of the claims of all Class members. Defendant's conduct—as outlined above—injured all members of the Class, causing them to unnecessarily spend thousands of dollars on improper fees and interest.

109.   Ms. Stewart will fairly and adequately protect the interest of the member of the Class.  She has no interest antagonistic to or in conflict with those of the Class.

110.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Those common questions of law and fact include:

a.  Whether Defendant properly disclosed to Class members the existence of Convenience Fees, and the fact that they would be added to their loan balances, as required under TILA;

b.  Whether the contracts between Defendant and the Class members authorized the Defendant to charge Convenience Fees;

c.  Whether the interest charged Convenience Fees added to Class members' loan balances violates TILA; and

d.  Whether the interest charged on late fees added to Class members' loan balances violates TILA

e.  Whether the Defendant's accounting method of adding Convenience Fees to Class members' loan balance constitutes a material misrepresentation to Class members;

f.  Whether Defendant knew that representations regarding late fees and Convenience Fees were inaccurate when they were made, and whether Defendant intended on Class members to rely on the same;

g.  Whether Class members did, in fact, rely on Defendant's misrepresentations regarding the accounting of Convenience Fees and late fees;

    h.  Whether Defendant had a duty to disclose that Convenience Fees and late fees were added to Class member's loan balances;

    i.  Whether Defendant was negligent or reckless in failing to disclose to Class Members that Convenience Fees and late fees would be added to the Class Members' loan balances and accrue interest;

111.  Ms. Stewart has retained competent counsel who are experienced in class-action or large-scale litigation in federal court.

112.  Class litigation is superior to individually litigating the claims of each Class member.

113.  The individual damages of each Class member may be limited to a few hundred dollars.  As such, most Class members will be unable to retain counsel on a cost-efficient basis in order to enforce their rights.

## COUNT I
## VIOLATION OF THE TRUTH IN LENDING ACT

114.  Ms. Stewart restates the foregoing allegations as though fully incorporated herein.

115.  Defendant offers closed-ended lines of credit to consumers, including Ms. Stewart and the Class members, for the purpose of purchasing automobiles.

116.   Under TILA, "finance charges" include any and all charges "payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."

117.   TILA requires that creditors offering closed-ended lines of credit to consumers, including Defendant, disclose to consumers all "finance charges" and "any charges which are not part of the finance charge" . . . "which are financed by the consumer."

118.   Defendant failed to comply with the disclosure requirements of TILA in multiple ways, including, but not limited to:

      a. Failing to disclose to Class members the existence of Convenience Fees at the time their loans were executed;

      b. Failing to disclose to Class members that Convenience Fees would be added to their loan balance and accrue interest at the time their loans were executed; and

      c. Failing to disclose to Class members that late fees would be added to their loan balance and accrue interest at the time their loans were executed.

119.   As a result of Defendant's failures, Ms. Stewart and other Class members have each paid potentially thousands of dollars in impermissible fees and interest, resulting in significant economic damage.

## COUNT II
## FRAUDULENT MISREPRESENTATION

120.   Ms. Stewart restates the foregoing allegations as though fully incorporated herein.

121.   Defendant made numerous material misrepresentations to Ms. Stewart and Class members regarding fees added to their loan balance.

### The "Convenience Fee Scam"

122.   Defendant required Ms. Stewart and other Class members to pay a Convenience Fee any time they used the Payment Portals.

123.   Defendant made material representations that the Convenience Fee related to the payment method—i.e. Class members had to pay Convenience Fees *for the benefit of* utilizing the Payment Portals.

124.   This was false, deceptive, misleading, and constitutes a material misrepresentation.

125.   In reality, the Convenience Fees were added to Class members' loan balances without Class members' knowledge or consent.

126.   Defendant's Convenience Fee Scam  has no cognizable benefit for any Class member.  It serves solely to provide Defendant with the ability to (a) collect additional fees, and (b)  quietly increase a consumer's loan balance, all in the name of generating more profit for Defendant.

22

*__The "Late Fee Scam"__*

127.   In addition to the deceptive Convenience Fee Scam, Defendant impermissibly added late fees charged to Class members to their loan balance.

128.   Defendant represented that Class members would be charged a late fee, but never disclosed that late fees charged to consumers would be added to the Class members' loan balances and subject to interest.

__*The Deceptive Statements*__

129.   The profitability of the Convenience Fee Scam and Late Fee Scam was enhanced by Defendant's deceptive Statements.

130.   The Statements were intentionally misleading to consumers in numerous ways including, but not limited to, the following:

a.   Failing to disclose to Class members when fees, including late fees and Convenience Fees, were added to their loan balances;

b.   Failing to disclose to Class members that increased monthly payments were needed in order to pay off their loans on time;

c.   Including a "Delinquent Payment Due" item on the Statements, yet failing to identify delinquent payments until after the loan term lapsed;

d.   Failing to inform Class members that payments made by mail were not subject to Convenience Fees; and

23

e. Failing to alert Class members with increased loan balances that paying the original monthly payment amount would not result in timely paying off their loans.

131.   As a result of Defendant's misleading and deceptive Statements, Class members were not properly informed regarding multiple facets of their loan.

132.   In fact, the Statements lulled Class members into a false sense of security, as they continued to show the original monthly payment as being the only payment due, even when additional payments were needed to satisfy the loan in a timely manner.

***Defendant's Actions Constitute***
***<u>Fraudulent Misrepresentation</u>***

133.   At the time Defendant implemented the Fraudulent Scheme, it knew that the representations were false.

134.   Defendant knew that Convenience Fees were added to loan balances, not paid directly to Defendant *for the benefit of* using the Payment Portals.

135.   Defendant knew that Late Fees would be added to the loan balance yet failed to disclose the same to consumers.

136.   Defendant knew that the Statements would contain misleading information as outlined above.

137.   Defendant intended for Class members, including Ms. Stewart, to rely on the misrepresentations made in furtherance of implementing the Fraudulent

24

Scheme so that Defendant could increase its profits on loans issued to Class members.

138.   Ms. Stewart and other Class members did, in fact, rely on Defendant's numerous misrepresentations outlined herein.

139.   Without limitation, Ms. Stewart and class members (1) entered into the Agreement relying on the TILA disclosures regarding finance changes, (2) paid Convenience Fees believing they were *for the benefit* of using Defendant's Payment Portals, and (3) made payments as directed in Defendant's misleading Statements.

140.   As a direct result of Defendant's material misrepresentations as outlined herein, Ms. Stewart and Class members have each paid hundreds, or even thousands, of dollars in impermissible fees and interest, resulting in significant economic damage.

## COUNT III
## SILENT FRAUD

141.   Ms. Stewart restates the foregoing allegations as though fully incorporated herein.

142.   Defendant failed to disclose material facts to Ms. Stewart and class members.

143.   These material facts included the following: (1) Defendant adds late fees to Class members' loan balances, subjecting the same to interest, (2) Convenience Fees are added to Class members' loan balances, not paid to Defendant

*for the benefit of* utilizing the Payment Portals; (3) Convenience Fees may incur interest as a result of being added to Class members' loan balances; and (4) paying only the "payment due" amount identified on Statements *does not result in timely paying off a loan* where the Class members' loan balance increased as a result of fees being added to the loan balance.

144.   Defendant had actual knowledge of these material facts.

145.   Defendant's failure to disclose these material facts gave Class members false impressions, including that (1) Convenience Fees were paid for using the Payment Portals, (2) late fees did not incur interest, and (3) making payments identified on the Statements would result in paying off the loan on time.

146.   Defendant knew that the Class members would have these false impressions, the direct result of which would be Defendant generating additional profits through the snowballing effect of fees and interest being levied on Class members' loan balances.

147.   Defendant intended for Ms. Stewart and other Class members to rely on the false impressions created by Defendant's material omissions of fact, in furtherance of the overarching Fraudulent Scheme identified herein.

148.   Ms. Stewart and other Class members did rely on these false impressions.

26

149.    As a direct result of Defendant's intentional omissions of material facts, and the false impressions created as a result, Ms. Stewart and Class members have paid thousands of dollars in impermissible fees and interest, resulting in significant economic damage.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

150.    Ms. Stewart restates the foregoing allegations as though fully incorporated herein.

151.    Ms. Stewart and the Class members detrimentally relied on information provided by Defendant including, but not limited to, the following: (1) Convenience Fees are paid *for the benefit of* using the Payment Portals, (2) late fees are a set amount identified in the contract between Defendant and Class members, and (3) information contained in the Statements was accurate and would result in Class members satisfying their loan obligations in a timely manner.

152.    This reliance was justifiable.  Ms. Stewart and Class members relied on information provided by Defendant, placing their trust on Defendant's superior legal and financial acumen to provide accurate information regarding payments made by Ms. Stewart and Class members.

153.    In fact, the information provided by Defendant was done so without reasonable care.

27

154. Defendant did not inform Ms. Stewart or Class members that Convenience Fees and late fees were added to loan balances, subjecting them to interest, and failed to alert Ms. Stewart and Class members with increased loan balances that relying on the "payment amount" provided by Defendant would not result in paying off the loan on time.

155. Defendant, as a creditor to the Class members, owed a duty to provide accurate, non-deceptive information regarding their loans and loan balances.

156. Rather than satisfying that duty, Defendant developed the schemes discussed herein aimed at increasing the profit generated by Defendant's loans.

157. As a direct result of Defendant's failure to deliver accurate information with reasonable care, Ms. Stewart and Class members have paid thousands of dollars in impermissible fees and interest, resulting in significant economic damage.

## COUNT V
## INNOCENT MISREPRESENTATION

158. Ms. Stewart restates the foregoing allegations as though fully incorporated herein.

159. Defendant made false and fraudulent misrepresentations to Ms. Stewart and Class members including, but not limited to, the following: (1) Convenience Fees are paid *for the benefit of* using the Payment Portals, (2) late fees are a set amount identified in the contract between Defendant and Class members, and (3)

28

information contained in the Statements was accurate and would result in Class members satisfying their loan obligations in a timely manner.

160.    These false and misleading representations were made during a transaction between Defendant (as creditor) and Ms. Stewart and Class members (as debtors).

161.    The false and fraudulent representations identified herein were, in fact, false, and deceived Ms. Stewart and Class members.

162.    As a result, Ms. Stewart and Class members paid Defendant interest and fees that were unauthorized under their contractual agreement and were not disclosed by Defendant.

163.    Until seeking legal representation, Ms. Stewart was unaware of the Convenience Fee Scam or the Late Fee Scam, i.e. she was unaware that these fees were being added to her loan balance and incurring interest at a rate of 18.95% per year.

164.    Defendant received a benefit from these misrepresentations in the form of additional profit generated from interest and fees added to Ms. Stewart and the Class members' loan balances.

165.    As a direct result of Defendant's misrepresentations, Ms. Stewart and Class members have paid thousands of dollars in impermissible fees and interest, resulting in significant economic damage.

29

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Regina Stewart f/k/a Regina Culbreath, on behalf of herself and those similarly situated, respectfully requests this Honorable Court enter judgment in the Class members' favor, and against Defendant, awarding the following relief:

A.     Actual damages in an amount exceeding $75,000 as provided in 15 U.S.C. § 1640(a)(1) and under Michigan law;

B.     Special damages, including attorney fees and costs, as provided in 15 U.S.C. § 1640(a)(2)(B) and (3); and

C.     All other relief that the Court deems equitable and just.

Respectfully submitted:

PAESANO AKKASHIAN APKARIAN, PC

By: */s/ Devin W. Bone*
Brian M. Akkashian (P55544)
Devin W. Bone (P78853)
7457 Franklin Road, Suite 200
Bloomfield Hills, MI 48301
(248) 792-6886 / (248) 792-6886 Fax
dbone@paalawfirm.com
*Attorneys for Plaintiff*

Dated: November 17, 2020

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REGINA STEWART f/k/a REGINA
CULBREATH, individually and on
behalf of all others similarly situated,

     *Plaintiff,*

v.

TIDEWATER FINANCE COMPANY,
d/b/a TIDEWATER CREDIT
SERVICES, a Virginia corporation,

     *Defendant.*

Case No.:

Hon.

**CLASS ACTION**

---

**JURY DEMAND**

Plaintiff Regina Stewart f/k/a Regina Culbreath ("Ms. Stewart"), for herself

and on behalf of others similarly situated, by and through her attorneys, Paesano

Akkashian Apkarian, PC, hereby demands a trial by jury in this action.

Respectfully submitted:

PAESANO AKKASHIAN APKARIAN, PC

By: */s/ Devin W. Bone*
    Brian M. Akkashian (P55544)
    Devin W. Bone (P78853)
7457 Franklin Road, Suite 200
Bloomfield Hills, MI 48301
(248) 792-6886 / (248) 792-6886 Fax
dbone@paalawfirm.com
*Attorneys for Plaintiff*

Dated: November 17, 2020

31